Call the first case. 09-3240 John Crane v. Admiral Insurance, et al. Okay, our John Crane case. Kevin Ford, I'll be arguing on behalf of the appellant. Okay. Rebecca Ross, I'll be arguing on behalf of the appellees and cross-appellant. Okay, we've got two appeals here. Very interesting briefs filed, by the way, which the court thanks you for. Normally, we only allow 15 minutes aside for oral argument. However, due to the complexity and the voluminous matters involved in this case, we're going to extend that to 30 minutes aside. So we'll begin with the appellant. We'll have 30 minutes. But from your 30 minutes, sir, apportion whatever amount of time you will need for rebuttal. Thank you, Your Honor. After your initial presentation, then we'll go to the appellee, and you will have your full 30 minutes at that time. Thank you, Your Honor. No rebuttal. Okay, thank you, Your Honor. Very good. Please support Kevin Ford on behalf of the appellant, John Crane. Oh, excuse me, by the way. Sure. The other member of our panel is Justice Connors, who could not be here today. I'm sure she will be reviewing and listening to the oral arguments. They're transcribed. They're available on the Internet. But she'll be listening to the audio portion and will participate in the opinion of the court. Sorry for the interruption, sir. Thank you, Your Honor. I know when you look at the pile of briefs that Your Honor has already referred to, quite a bit has been said, and some of it said more than once. So I'll try to focus this argument. That pile of briefs makes the case appear a little bit overwhelming. But after you analyze those briefs, as I'm sure you have already and will do again, the case is not very complicated. It is a breach of contract case. It's simple in that it's been construed many, many times. The same language of this insurance policy has been construed many times, including our Supreme Court. It's been construed by this court in the appellate decision in the Raymark case. And this court has had many other opportunities to review it and consider what Raymark means. And that's what this is about. What does Raymark mean? And I have to tell you, after reading Raymark and the other cases over and over again, I don't think I have ever been more comfortable standing at this podium and telling the court that I think our position is the one that should carry the day. I think when you look at the policy language here and look at what's to be decided, I think that Raymark is as close to all fours as you're going to see. I know that's a pretty overworn term, but when you look at Raymark and you look at this policy, this is a Raymark case. Let me ask you this. Does Raymark have some whiskers on it by now? Possibly medical science has passed the knowledge of Raymark. First of all, the record in this case demonstrated that it hasn't. There was a medical trial, and the trial judge decided that on the factual issue of the question, did exposure to asbestos cause cellular damage, the finder of fact said, yes, it did. But in doing so, didn't Judge Canary, as you point out and only one of the Eppolese points out, in using the triple trigger of Raymark, they used the phrase and. You had to show all three triggers apply. That is one of the errors that I'm going to refer to in this argument, Justice Quinn. But, yes, she required for exhaustion all three triggers. Raymark could not be clearer. And that wasn't. There's no whiskers on that. Raymark says bodily injury occurs on exposure. And that can be multiple times. It said bodily injury also occurs on sickness. And it said bodily injury also occurs on diagnosis. There is that. And that law has been repeated over and over and over again by this court. What I said, one of the reasons I'm so comfortable with the case, when I'm reading the cases and getting intimate, not familiar, intimate with some of these cases, three of the four or five main cases are Warren Wolfson's cases. I mean, and another one, U.S. Gypsum uses the language, and that's Justice Joseph Gordon. I mean, it just doesn't get any better. So the whiskers on Raymark, Justice Wolfson didn't think there was anything stale about it. But he didn't follow it either, right? He said in discussing Raymark, he said he had no problem on the pro rata issue. He said Raymark doesn't even refer to policy periods, which, of course, it does twice. I don't know how Warren missed it. Yes. You're absolutely right. So I'm just saying before we gild the lily too much with my friend Warren Wolfson, he did disagree with you as to the pro rata issue. Well. As did Joe Gordon. So another brilliant jurist. They like pro rata, apparently. No, I don't think they do. In Merrimont, Justice Wolfson said, the phrase during the policy period contained in the various occurrence definitions defines what has to happen to trigger the policies. It is not a limitation on the insurance company's promises to pay all sums. That's what he's meaning. What he means there is they pay all sums. No, no rotate. No proration. In his last opinion on the subject, he says, and I'm going to quote him a little longer than I'd like, but it's, I mean, he's more important to you than I am. So I'd rather use his words than mine. In Zurich Insurance versus Raymark, our Supreme Court addressed the trigger of insurance coverage in cases involving bodily harm for asbestos exposure. The court noted in most cases more than one insurance carrier would be obliged to provide for an asbestos-related disease. The court was asked to consider whether each carrier whose policy was triggered was jointly and separately liable for the total indemnity and defense costs of a claim without proration. The Supreme Court noted the policy language, and then he refers to the all sums language. The policy language did not provide for proration. The court held that an insurer must afford Raymark coverage of a claim if the claimant suffers bodily injury or sickness or disease during the policy period. The triple trigger for coverage means several different insurance companies will be implicated by a single claimant's asbestos exposure claim. That resolves every issue in this appeal, except on the exhaustion question. I'll give you, in that case, and that happens to be the last, from my research, the last asbestos case. It wasn't an asbestos case, but he referred to the asbestos cases. But, Justice Wolfson, that case, as your honors will recall, involved, was a consumer fraud act, and they were talking about the sale of crayons by a seller that contained toxic materials. And the question was, what's the law on trigger coverage there? Justice Wolfson talked about what happens in bodily injury cases, and that's the part I just quoted to you. And then he goes on to say, where you can identify, where you can identify the year that the crayons were sold. That is, when you compare the injury with a policy period, it's all sums. Otherwise, where you cannot allocate, where you cannot hook up an event like a bodily injury with a policy, in that case, proration. And that, I think, is, and that's the gospel according to Wolfson, and that is the latest case on the subject. I'd like to spend a moment, because there's so much time in the briefs, talking about the second district opinions. And I don't think they helped, I don't think that they helped the insurers either. In the first case, an outboard marine, the court, unlike, first of all, the court acknowledged Raymark as the law of the land in bodily injury cases. They then said, in a case like this, where we were talking about PCBs, toxic materials, going into Lake Michigan, it is very difficult to identify when the injury to the lake occurred. It's not like a personal injury case, where we know when exposure happens. We know when the diagnosis happens. So they said, there, we're going to use proration. Now, the interesting thing about outboard marine is only that as soon as the ink is dry in that opinion, a trial judge in Lake County has a problem applying it. So he certifies the question. The question goes up to the second district. Two of the same three judges, Bowman was one of them, and he wrote the second opinion. That second opinion is the decision in the Missouri Pacific Railroad case. That case involved injury to hearing as a result of noise. Very difficult, as I say, like the water pollution. Very difficult to match an event with a policy. And so the trial judge basically said, what do I do? The same panel, two of the three same justices said, where you can allocate, and that's maybe not the best word to use, but what they meant, pair. Where you can pair the timing of that noise injury to a policy, that policy is on the hook, all sums. If you cannot allocate or pair in that case, then you use a prorata. As I read U.S. Gypsum, Judge Gordon said, all of the policies are liable for all sums. He did not even allow for proration. So I think that the law is, the all sums law is clear, and that is one of the rulings that we ask that you reverse in order that these policies, the excess and umbrella policies here, provide for all sums. On the second question, that's because the second thing we had to prove is whether we exhausted, whether in the underlying case we exhausted all of our policies. Now, there was only $9 million in insurance up to 1958, the biggest period here. When you count the entire period going through 2002, there was $41 million in coverage. Just as Judge Kenard said, we know they pretty much exhausted. In fact, one of the frustrating things about when you read the record is everybody in the courtroom knew that they had exhausted the coverage. It was a question of how to prove it. And then we proceeded on the proof. And I said, as I said, Kemper had paid out by night, by 2004, they had paid out $43 million. By the time the case went to trial in 2006, they had paid out $51 million, and they've been paying out a whole lot since. So, I mean, allocation really isn't, exhaustion really isn't going to be an issue if we get back to the trial court, because there are all kinds of judgments. And if you do that, if we were to send it back for a, back to the trial court, and for essentially a new hearing to properly, perhaps, is the phrase I would use, for the triple trigger, you at that time would be able to show, attempt to show anyway, that include all the period of time from the last hearing to whenever you have your hearing next year or later this year. Is that right? To try and show exhaustion. Yes, I believe so. And there are millions and millions of dollars in judgments paid since. You attached to your brief a copy of an order written by Judge Flynn. Yes. One of our brighter chancellors. And he points out in there an interesting question about exhaustion, that he could not find a case that discussed the issue of exhaustion in terms of asbestos cases where they broke it down by policy periods. I don't know if you caught that when you attached these. It was an important thing. And I have a question about this. So generally, though, the way, as I read this evidentiary hearing that occurred already in this case, was your position there is what it is today. Listen, whatever it is, we paid more. Whether it be $42 million or $51 million, we paid in excess of all. So all of our primary insurance has been exhausted because we gave out more in judgments than the value of the policies. Right? But there was really no effort to break it down along Judge Flynn's concerns, saying, well, in the 48 policy, where did that go in primary? When did the 54 policy get used up? Right? No, we did. Okay. We assigned it. And Judge Flynn raises an interesting issue. But you do. Yeah, we can assign it. We can assign each judgment to a particular year. And that's an exercise that we thought we did. But then at the end of the day, when Judge Kinard ruled, she said, ah, but you didn't prove all three triggers. And one of the reasons, first of all, that didn't come up until the end of the case. But one of the things wrong with that rationale, and that's our primary error on the exhaustion issue, is that, as the Supreme Court says in Raymark very clearly, it is impossible to prove all three triggers. Because some people, sickness is often not manifested. Exposure, there's, in the record in these cases, there was evidence of exposure. In the underlying tort cases, they had to prove they were exposed to asbestos. There were 67, talk about your allocation question, Justice, there were 67 judgments. And a stipulation of 67 diagnosis states. So we can line up policies with those diagnosis states. The other, I'm running out of time, the other issues that I would like to mention on the question of exhaustion. The trial judge would not allow evidence of this agreement we made with Kemper regarding exhaustion. We had an agreement that we had exhausted. We had negotiated a deal where, instead of settling cases, they would continue to resist the cases. And the parties agreed, and we cited where they agreed, the parties, the insurers agreed, that if that agreement was relevant, then they'd concede that we exhausted it. And she would, that the trial judge would not allow any evidence of that, the ACC that's referred to in the briefs. We believe that on remand, that the circuit court should be required to allow us to use the ACC. Finally, another one of the issues on appeal. Would it matter? In the end? Right, in the end. For the reason we discussed earlier, I'm not sure. It would make things a lot easier because we wouldn't have to even have to go through this, based on their stipulation, we wouldn't have to go through this drill. Right, but let's say that we disagree and that the ACC should not apply. Even then, you still have evidence that you paid out $51 million, several million more than your primary insurance called for, right? Justice Quinn, I think we're still going to win, yes. Okay. And then the final error, after we rested, there was a motion for a directed finding. The court weighed the evidence, did everything appropriate at that time, and denied the motion. No evidence from the insurers. Then she ended up entering a judgment contrary, using the same standard, entered a judgment contrary to her earlier finding that denied the directed finding. So directed finding. I thank you very much for your attention. I saved my eight minutes or so, unless there's any questions. You've got ten minutes left. Thank you very much. Sure. FLE. Good morning. Good morning, Your Honor. May it please the Court. I'm Rebecca Ross, and I represent the CNA Companies, Columbia Casualty Company, Continental Casualty Company, and the Continental Insurance Corporation. Today I'm going to be speaking on behalf of all of the insurers in this action, with respect to the issue on Crane's appeal. That's exhaustion and allocation. And then at the end, I would like to turn to the cross appeal on Trigger, and then I will be speaking only on behalf of my own clients. As Your Honors are well aware, John Crane brought this action in May of 2004, seeking insurance coverage for asbestos bodily injury claims brought against him. Judge Dorothy Kinnaird handled this case for more than six years. She resolved more than 25 motions for summary judgment. She held two trials, one of which lasted more than 18 days. And as a result of all of that hard work by Judge Kinnaird, many of the issues have been resolved, but three remain, exhaustion, allocation, and Trigger. And I'd like to start with exhaustion, if it makes sense to Your Honor. With respect to exhaustion, there are two issues that are pending in this appeal. The first is whether the trial court properly found that John Crane had to prove exhaustion based on the policies as originally issued, not as changed through the ACC, the Agreement Concerning Coverage. And the second is whether John Crane met that burden of proving exhaustion after the trial. I want to look at the first issue first. Although Crane spends a lot of time talking about the Agreement Concerning Coverage, it really has nothing to do with that issue at all. And why is that? Because in October of 2006, John Crane bought out all of Kemper's policies. It entered into a full policy buyback at that point for Kemper's primary policies and their excess policies. Thus, when the court was looking at the question of what John Crane had to do, it was governed by Illinois law that very clearly states that when an insured settles with its primary carrier, the excess carriers receive a credit for the full limits of the policies. And you can look at Outboard Marine Corporation, and it very clearly states that. Moreover, it is also clear that John Crane can't make that coverage unavailable. If you look at the Kojima case, the Illinois Supreme Court looked at this issue in the context of a targeted tender and horizontal exhaustion. Now, as your honors are well aware, horizontal exhaustion requires that before an insured can get to its excess coverage, each and every policy that apply to a particular claim has to be exhausted. The court looked at targeted tender and said, you cannot make some of that coverage unavailable by refusing to tender to it. You still have to exhaust that coverage because horizontal exhaustion trumps targeted tender. The same kind of situation occurs here. Judge Kinnaird properly made the determination that John Crane had to prove exhaustion based on the policies as they were originally issued. The second question, which is one that the brief spent quite a lot of time on, was whether John Crane met that burden of proof. Let me correct this for one moment, Ms. Ross. Sure. And the principle then that Kinnaird would have been following is perhaps she was prescient in seeing that Kajim was going to come down first by Denise O'Malley on our court and then the Supreme Court. Why does that say the ACC should not be considered? How do they match up? Well, there are a couple of answers to that. With respect to kind of the global question, the agreement concerning coverage, what it did was it changed the terms of the primary policies and made it so that defense would exhaust those policies. It also changed the manner in which the other primary policies would be exhausted and made it so that instead of spreading it out over all of the triggered years, they would only spread it out over a very tiny amount so that they could get rid of the policies where defense was outside of limits. What the court ultimately determined in that was that the excess carriers who are not a party to that agreement are not bound by that. And so what she looked at was the settlement and looked at the case law on what happens when you settle with your primary carrier and properly we believe determined that the excess carriers get a credit for the full limits of the policies. With respect to the second question concerning whether John... Oh, I'm sorry. It's quite all right. I was dazed. Going back to that then, your argument is that the trial court was correct in saying that even excluding the ACC, that Crane still did not show that they had spent enough money on settlements at the time of the trial, 2008 in front of Dorothy Kennard. That's correct. And it's not just a question, Your Honor, of how many dollars were spent. It's a question of what policies were triggered by a particular claim. And then you allocate the amount that was expended for that claim. All of these are judgments. You allocate the amount that was expended for that claim over the triggered policies. And they have to demonstrate that every triggered policy that relates to that claim has been exhausted in order to get to an excess carrier. And how did it not occur here where they spent many millions of dollars more than the face value of the policies? Well, there are two answers to that. The first answer to that is that they didn't try. What John Crane proposed to the court and what the court adopted over the defendant's objection was that all John Crane had to prove was a, quote, reasonable and reliable allocation. In other words, John Crane did not try to prove with substantive evidence any of the dates of the policies that were triggered. They never tried to prove an exposure date. They didn't try to prove a sickness date. They had diagnosis dates stipulated. But apart from that, John Crane did not put in any substantive evidence at all. So when John Crane was looking at what, it made a bet effectively. And what it decided was it would be a whole lot easier to just try and prove a reasonable and reliable allocation without having to prove all of the underlying facts. They were coming in under Rule 703. Well, unfortunately for them, what happened was their reasonable and reliable allocation was neither reasonable nor reliable. And that's what Judge Kinnaird found. They did not give her another option. They did not come in and say, at the very least, here are the things that we're proving. Give us exhaustion based on that. No, they didn't do that. What they did was they came in with what they stated was a reasonable and reliable allocation that was anything but. And so what Judge Kinnaird did was what any judge would do, which is she looked at what they had presented to her. It didn't meet the standard. And she said, I'm sorry, but you haven't proven exhaustion. I think what's important about this in terms of what the judge did is the lengths that she went to to try to help them as they were going through the exhaustion trial. And if you give me just a minute, I'd like to give you a couple of examples. For example, she let them use the defendant's exhibits because they hadn't bothered to designate any of their own exhibits for the exhaustion trial. She allowed them to produce checks which had been requested in discovery but not ever given to the defendants on the first day of trial and in the middle of trial and allowed them to try to prove how much had been paid based on those checks. She started and stopped the trial so that their expert could go back and review the documents so that he could figure out what he wanted to testify about. She allowed them to modify their 213F disclosures in the middle of trial. She allowed them to do new allocations during trial which then required new depositions. She kept telling them what it was that they needed to do in order to prove their case. And at every point in time, they basically said to her, we don't think so. We don't think we have to do that. And so they didn't. So what they ended up with was a trial in which Mr. Jones, who was their only expert, came in and he started a trial that John Crane demanded over and over again that they be allowed to go forward on. He came into trial without ever having reviewed the documents on which his opinion was based. The court had to stop the trial, have him go back out, review the documents, and then try and figure out what he wanted to testify about. He relied on the opinions of a rebuttal expert that he'd never spoken to, that he had no idea how she reached the conclusions that she reached based on documents that she had culled for a completely different purpose. He didn't even understand how she had culled those documents. The court found that Mr. Jones had relied uncritically on every document given to him by Crane's counsel and that that was inappropriate. Some of those were not reliable documents. The court found that John Crane presented no reliable and credible evidence on exhaustion. She found that counsel's influence was so pervasive that Mr. Jones didn't do a true independent expert review of the claim documents on which his opinions were based. She found numerous inconsistencies in the application of the protocol and she found that he had deviated from his own protocol in reaching his conclusions. So in a situation in which the only thing John Crane is presenting is a witness that's supposed to prove a reasonable and reliable allocation, she made a finding that John Crane failed to present the court with competent and credible evidence upon which to base the finding of exhaustion. But then she went one step further. She went back and she looked at every document she had not admitted to see if it would change her mind because she was obviously troubled by the fact that John Crane was going to end up with nothing and she found that her findings would be no different. And the statement she made is really telling. What is missing here is a credible opinion based upon an ascertainable and professional protocol in reviewing underlying claims documents. That was clearly not against the weight, the manifest weight of the evidence. And that finding clearly should be affirmed. I do before I move on to allocation want to very briefly talk about this standard of whether Raymark applies conjunctively or disjunctively because I don't want the court to be confused by it. I think what John Crane is saying to you is entirely incorrect. And the reason that it's incorrect is that Raymark is a trigger case. Trigger is what policy can be called upon to pay for a particular claim. It is not an exhaustion case. Exhaustion does not come up in Raymark. Exhaustion is whether all of the policies that could pay have paid. So then let's go back to our horizontal exhaustion question. You have to demonstrate in order to get to your excess coverage that every potentially applicable policy has been exhausted. That's an and. In other words, if you have a claim that has, for example, a claim for $150,000 where the exposure happens in 1966 and the sickness in 1989 and the disease in 1991 as an example. If you just come in and prove the bodily injury in 1966, and you say, okay, I want to exhaust that policy and then I want to go up to the excess policy. No, you can't do that. Because there are other potentially applicable policies. You have to go down and prove when the sickness happened and use that policy. You have to go down and prove when the disease happened and use that policy. Because all of that potential coverage has to be horizontally exhausted. Raymark does not deal with horizontal exhaustion, and it doesn't deal with exhaustion at all. To suggest that you can change a trigger case into an exhaustion case is entirely inappropriate. I'd like to, if I could, move on to the allocation question. Allocation is a question of how loss is divided among time periods when the injury occurred. And the court in this case followed a long line of Illinois cases and properly adopted a pro rata by time allocation. The court properly determined that the policies only cover bodily injury during the policy period. Now John Crane says, well, wait, all the policies say that they agree to pay all sums on behalf of the insured. But that's not true. All the policies do not say that. Some of the policies, the Columbia policies as an example, some of the excess policies as another, don't even contain the words all sums. But every policy, every single policy at issue in this case provides that it only covers bodily injury during the policy period. Some say that in the occurrence definition, some in the bodily injury definition, some in the policy period provisions would say this policy only applies to bodily injury that occurs during the policy period. But the policies all cover only bodily injury that happens during the policy period. So to the extent that the policies cover all sums, it's all sums for bodily injury during the policy period. Now John Crane then says, well, but look at Raymark. Raymark has decided that it's always all sums in an asbestos bodily injury claim. But that isn't what Raymark did. Raymark never established some sort of a rigid all sums rule and said you have to apply this in every case or you have to apply this in every asbestos bodily injury case. There were three paragraphs in the Raymark case that dealt with allocation. What Raymark looked at was a single part of a policy. And that policy in Raymark said that the insurer agreed to pay all sums that the insured was legally obligated to pay. There was no qualifying language. The court noted that there was no qualifying language. It said, okay, that language means what that language says. But in our case, even the policies that have all sums language, all of them have a provision that say, subject to the limitations, terms, and conditions hereinafter mentioned. In other words, subject to the fact that these policies only cover bodily injury that occurs during the policy period. That was also true in Raymark, was it not? No, it was not true in Raymark, I don't think. Well, I refer you to 118 Illinois 2nd. It starts at page 34. Actually, it's page 33. So it's coverage A, bodily injury liability. Occurrence means an accident, including injurious exposure to conditions, which results during the policy period. Yes. Oh, I'm sorry, Your Honor. There were provisions in the Raymark policy that were not discussed in the allocation, all sums ruling portion of the opinion, but were discussed earlier, that indicated that the policies only covered bodily injury during the policy period. But if you look at the section on the pro rata versus all sums allocation in the second paragraph, they focus on the fact that Zurich undertook to pay on behalf of Raymark all sums which Raymark shall become legally obligated to pay as damages because of bodily injury caused by an occurrence. So in other words, the language that I'm talking, they don't go through and look at all of the other provisions of the policy that relate to bodily injury during the policy period. Instead, they are only looking at the stark statement that they will pay all  sums. At page 57 of Raymark, it's already noted, unlike 48 installations, this court has held that an insurer must afford Raymark coverage of a claim if the claimant suffers bodily injury or sickness or disease during a policy period. Right. And that's the trigger portion of it. But the question is then once you do that, how do you allocate the costs that you have to cover? Right. Why would they reach exhaustion since that wasn't a question? And what they ended up doing was they looked at the 48 installations which applied an exposure trigger. And they had said to this court and also to the Supreme Court that the court ought to apply the 48 installations ruling, both the trigger and the pro rata by time allocation portion of it. When the court rejected the 48 installations trigger, then it also rejected the 48 installations pro rata allocation. But there was nothing in Raymark that says in any manner that that is the only way that you can allocate loss. And in fact, if you look at what has happened since Raymark, Illinois courts have answered kind of the questions that Raymark left open. And they have repeatedly held that if you can't determine precisely how much injury or when injury happened in a particular year, you should use pro rata allocation. And how many of those cases apply to bodily injury cases as opposed to property damage cases? I would say that the Missouri Pacific case is the cleanest case for us. It was an asbestos bodily injury case. Which I only mentioned in one sentence though, right, that they refer to the NIHL, the loss of hearing, throughout it. And they put a sentence in, oh, by the way, we're applying the same theory to asbestos. It wasn't really briefed or argued much. So it does cover asbestos, but in one sentence. Well, I mean, they do say our reasoning applies equally to hearing loss claims and the asbestos exposure claims. I mean, they clearly addressed that question as directly as they possibly could. And in Missouri Pacific, they clearly said that nothing in RAMARC precludes pro rata. And that it is appropriate when an unallocable loss implicates successive policy periods. But it's not just Missouri Pacific. I mean, the issue of whether or not you can utilize pro rata allocation has come up in Outborn Marine in an environmental case. Triple A disposal, which is another environmental case. Illinois Central Railroad, which was an employment discrimination case. And the Binney case, which this court has been talking about this morning, which was an advertising injury case. In every one of those circumstances, the courts looked at it and said, if you can't determine exactly how much injury is in a particular year, it's appropriate to use pro rata allocation. And we would submit that the court appropriately determined that the pro rata allocation more clearly tracks the policy language for bodily injury during the policy period and is a fairer allocation. Taking that is true. It makes a lot of sense to me, frankly, as counsel. But then you read Judge Flynn's order saying it sounded good to him, too. And he's a really smart guy to meet Mr. Flynn, Judge Flynn. And he tried it and it didn't work at all because, guess what? The insurers couldn't agree. Shockingly, I know in a courtroom that they couldn't agree on coverage. And so he just found it was just spinning wheels for the length of the case. That nothing was ever settled. The insurers would not agree to anything. And so he says, well, I'm going to make it all sums up. And that's what he did. Well, at that point, I mean, that case is actually, it's not done yet. It's not clear. He's already reversed himself once. It's not clear where he's going to end up. I would submit to Your Honor that when you, or if you would issue a ruling on pro rata, that perhaps it would clarify it for Judge Flynn. It does seem to me that pro rata is much more appropriate given the policy language that we're talking about. There's absolutely no basis to ignore the language in the policy that indicates that the bodily injury has to occur during the policy period. There's just, I mean, there's, this court has said over and over again that you cannot just look at one part or two words within a policy. That you have to look at the entire policy and apply all of it. And if you apply all of the terms of these policies, it's very clear that they only apply to the bodily injury that happens during their policy period. And to implicate an all sums ruling in that circumstance would be entirely inappropriate. I would also note for Your Honor that there's another wrinkle in this case that we should probably make sure the court is aware of. The Columbia Casualty Company umbrella policies only allow exhaustion of the underlying coverage with respect to bodily injury that occurs during the policy period and not before. So, for example, if you tried to exhaust the policies beneath the underlying injury that occurred five years before into the Columbia policies, it would not exhaust the policies underlying the Columbia policies. I mean, those policies have gone out of their way to make it clear they're only talking about bodily injury during the policy period. They only come in after the underlying policies are exhausted with bodily injury during the policy period. We're done. And I would submit to Your Honor that the court in looking at that and looking at all of the language, not only the Columbia policy language, but all of the policy language appropriately determined that the right way to implement the full version of the policy was through a pro rata by time allocation. I'd like to, I think I still have about five minutes. I'd like to get to the trigger cross appeal if I could at this point. With respect to the trigger cross appeal, we are, of course, talking about what needs to be shown in order to get a particular policy to pay. And the trigger ruling, in our opinion, should be reversed because the court incorrectly believed that she was bound by the Raymark trigger ruling. Now, if you look at the court's ruling both on summary judgment and as the result of the trigger trial, she repeatedly stated that she thought that she was, that she was required to follow Zerk v.   result of the trigger trial, she repeatedly stated that she thought that she was required to follow Zerk v. Raymark and they had found that exposure equals bodily injury. It's true. That's what the court found there. I will note for you that they found it because no one contested it. All of the parties in that particular case had an interest in finding that bodily injury occurred at exposure. But Raymark was an injury in fact case. It found actual bodily injury. It found that proving that bodily injury might or might not happen is insufficient to meet the burden. And what the CNA companies did in the trial court was to demonstrate that the evidence over the last 30 years has changed. It's not the evidence that the Zerk v. Raymark court was looking at. Indeed, if you look at Zerk v. Raymark, they didn't have any idea how mesothelioma, as an example, occurred. They didn't understand that it was a function of mutations with respect to 6 to 10 genes. That you had to have mutations to all of them in order to get your first cancer cell. So that the medical evidence has changed dramatically in the last 30 years. But in this case, the experts used were both insurance company experts, right? So the two insurance company experts agreed that really, and again, I'm a brutal, nasty guy. Oh, there's no such, there's really not a big problem with this. It shouldn't be triggered by a mere exposure. But those are two insurance experts. In this case? Yes, in this case. Who did you have? No. I will testify what evidence was put forth regarding this. John Crane put forth Dr. Gabrielson and Dr. Brody. And Continental Casualty Company put forth Dr. Cohen. Right. So you had three experts. All in the employee who? In insurance, right? An asbestos producer or manufacturer involving it. And an insurer defending against suits involving asbestos. Not to say it's unfair. It's a coverage issue at this point. So I'm not saying you should have reached out. Why wouldn't you reach out for plaintiff's experts? Well, actually, they did. Dr. Gabrielson and Dr. Brody are plaintiff's experts. So they did reach out to the plaintiff's experts in a kind of bizarre kind of reversal of roles. But in that, and when we went through our brief, Your Honor, what we did was we gave you the undisputed evidence. In other words, we quoted to you what Dr. Gabrielson and Dr. Brody said with respect to this, as well as what the court ultimately found. Because there really wasn't any dispute. There really wasn't any dispute about how the bodily injury occurs or the fact that you really couldn't tell when that bodily injury occurs. And the court, based on the admissions of Crane Zone experts, made a number of findings. One of them was that you don't know when the processes leading to asbestos-related disease occur. That's absolutely correct. That's what the experts said. Court found that not everyone who is exposed to asbestos, including not everyone who is exposed to high concentrations of asbestos in the course of time, develops asbestos-related diseases. So the court specifically said, look, exposure is not enough. The court then said, working backwards from a deadly tumor like mesothelioma, one cannot determine when the various mutations first arose in the cell lines, creating the first cancer-relevant mutation. She also found that no one can determine whether any given mutation occurred by chance, by asbestos, or by another cause. And then she looked at what John Crane had asked her to do to expand the definition of bodily injury to encompass the genetic damage and mutations to the cells and the surrounding tissue, and she said, in medical science, no one outside of litigation refers to processes such as mutations and macrophage reactions as injury. Now, why did she say that? Because those two things, macrophage reactions and mutations, happen to every single one of us, every single minute of every single day. Which in its logical conclusion would mean that no insurance company should ever pay out on a meso case or a asbestos case. Would that be right? No, actually. I don't think that's what Illinois does. I think that what happens is you have to look at U.S. Gibson. Yes, you do. Because what U.S. Gibson says is that if you cannot prove, you know that bodily, or you know that injury occurs, but you cannot prove precisely when that happened, then you utilize an equitable continuous trigger, and you utilize it from the date of first exposure to the date of manifestation or death, and at that point in time, then you utilize a pro rata by time allocation to spread the loss over the entire period of time. That's what the courts ultimately did in outboard marine and in Missouri Pacific and in AAA disposal. But going back to U.S. Gibson, Joe Gordon's case, he says the challenge by the insurers in a coverage action may therefore not address the issues as to whether the underlying plaintiff sustained damage for which the insured is liable. That was the subject of the underlying action. The coverage action may only address whether the damage in question falls within the coverage provisions of the policy. Right, so it's a question of is it within your policy period? You can't, what he is talking about is that when you settle a case, you as the insured don't have the obligation to come back and prove your own liability. That's the first part of what U.S. Gibson says. But the second part is, but you have to prove that it falls within the terms and conditions of one of the policies. In other words, you have to prove that there was injury during a policy period. And so then he is addressing the fact that when you get to a point where you cannot prove that, it's impossible to prove that, and I think it's true here, then you can utilize a fiction, an equitable continuous trigger from the date of first exposure to the date of diagnosis or death, and you spread out the loss during that entire period of time. And yes, you require an insurer who doesn't have absolute proof of injury during a particular policy period to pay. Yes, that's correct. But you also spread it equitably in a way that allows the insured to obtain insurance coverage in a situation in which they would otherwise not be able to do so. Your Honor, the insurers ask that the court affirm the trial court on the issues of exhaustion and allocation. The CNA insurance companies ask that the court reverse the trial court on the declaratory judgment relating to trigger and apply an equitable continuous trigger to future claims, and that there be no, and that the case be remanded solely for the purpose of allowing the CNA insurance companies to demonstrate when injury did not occur, precisely the kind of issue that Benny addressed at the end of that  Thank you, Your Honor. If you have no other questions. Thank you. A few comments on the bottom, please.  First of all, I would like to make a reference to Mr. Ross' final arguments. There were underlying judgments here. We know there was an injury. We know that because a jury said so. Secondly, relying on U.S. gypsum, keep in mind that Justice Gordon starts his opinion by explaining the difference between bodily injury cases and property damage cases. And he says, as Raymark teaches, in property damage cases, we know, I apologize, in bodily injury cases, we know when the injury occurs. And those policies are triggered and they pay all sums. Now, they make the argument, the insurers make the argument here, well, what he really means is they only pay the damages, and sometimes they change the language in their briefs from bodily injury during the policy period to damages suffered during the policy period. Now, if the bodily injury occurs and can be matched up with a policy, they pay all sums. And I'll give you a simple example. Let's suppose all state has an insurance policy that covers a calendar year, and it runs out on December 31. And the holder of the policy has a horrible accident on New Year's Eve. These insurance companies want to tell you that all state pays for the bill to drive the, to bring the ambulance bill to the hospital. The millions of dollars that are incurred later are paid by the insured, by a successive company, or someone else, or maybe nobody. And because in these specialist cases, this is a real problem. Many, we have been paying, many companies can't pay. But in the, in the Raymark, what Raymark teaches is just like that auto case, if you can match a bodily injury, and that exposure, diagnosis, if you could, if you could match that with a policy period, they pay all sums. And just like that auto case. But Ms. Ross' argument, and it's throughout all the blue briefs, is just as she argued here, saying that what happened here was, in spite of Judge Kennard's strong suggestions, delaying trial, ordering your client's expert witness to review documents, they argue that, you know, a lot of that wasn't done. That the normal prep work for a trial, especially of this magnitude, simply wasn't done. Were you part of the trial team, Mr. Ford? I was not. Very good. Then I'll be a little more correct. You can be as critical as you like. That's as far as I'm going, Mr. Ford. You know, Mr. Reese's report suggests in his brief that this is a, Crane is engaging with a junkyard dog defense. And I was on the initial panel that prevented Mr. Crane from appealing an order by Judge Kennard where she wouldn't grant an injunction, or did grant an injunction, if I recall, to preclude Crane from filing similar suits, covered suits, all over the United States, because that was his plan at the time. And then Judge Tooman came in and essentially affirmed that later on by taking the appeal and saying, no, the case was here. So Crane was not allowed to fly all over the United States and throw this stuff at the fan in many, many states. They're stuck here. That's a problem, having been a trial guy many, many years ago in a prior life, when you demand trial, what happens is sometimes you get trial. And when you get trial, you've got to be prepared. And when you choose to demand trial and force a trial when you're not prepared, that is on you. Not you, Mr. Ford, but your client and prior lawyers. When they decide they want to have hearings and they fail to call proper witnesses, fail to put in proper foundation, which, again, I don't think it would be that hard. I'm a simplistic fellow. I would think if you hedge judgments, how can you lose that case? How can the coverage not be exhausted since it's many millions more than on its face? I don't get it. I don't know why your predecessors in trial couldn't go backwards and say, well, this is the judgment and here's where the allegations are in that complaint. It would seem simple to me. Again, I'm not a civil lawyer. But that apparently wasn't done. And that's the hangup. Lisa, their argument, the insurers are arguing that wasn't done. Why should we save it? Let me put it this way. The heart of the problem, looking back, is that the trial court was analyzing, was looking through the wrong legal lens. She was analyzing it from a completely wrong legally perspective. And then trial counsel, which, I mean, the test, as Ross said, is reasonable and reliable proof. You don't have to prove the underlying cases. You just have to prove you paid the judgments. It should be an easy drill. But if you read that record, they went what I would call, they were faced with Stalingrad defense. Every issue that the plaintiffs tried to put in, well, you don't have the date of that judgment. You just have to identify a year. You don't have to identify a date. And Judge Kennard said, yeah, you have to identify the precise date of exposure. No, you don't. You only have to identify the year that he was exposed. And they went through that day after day in that trial. And then in the end, she said, well, like the insurance companies have pointed out, you didn't prove all these dates. You didn't prove this. You didn't prove that. They didn't have to prove it. She held them to the wrong standard. And incredibly, well, they say how the insurers say how critical Judge Kennard was of the plaintiff's case. When they rested, she weighed the evidence and said they made out a case. Then she writes an opinion evaluating the same evidence and said they didn't. That in itself is reversible error. Unless there's another question or so, I'm sure you've heard enough of this case. Thank you, Your Honors. Thank you very much. Thank you for your well-written briefs and your well-presented oral arguments. This case is taken under advisement.